THOMAS, Circuit Judge,
with whom PREGERSON, REINHARDT, and W. FLETCHER, Circuit Judges, join,
dissenting:
On January 15, 2003, Raul Morales-Izquierdo and his United States citizen wife, Patricia Morales, attended a meeting at the INS’s Tacoma, Washington office. The Moraleses expected to discuss the I-130 alien relative petition that Patricia had filed on March 1, 2001, to adjust her husband’s status to that of a legal permanent resident. Instead, the INS served on the couple both a denial of the petition for adjustment of status and a notice of intent to reinstate a 1994 deportation order against Raul Morales under INA § 241(a)(5).
Morales has consistently and emphatically maintained that the 1994 deportation order is invalid because he was never given notice of the 1994 hearing at which he was ordered deported in absentia. In a sworn statement, Morales claimed never to have received the notice that was sent to his ex-girlfriend’s house, explaining that someone else had signed to indicate receipt of the notice. He has never been granted a hearing at which he could present his case; the majority opinion assures that he never will be.
This result would have been impossible under the regulations that governed reinstatement proceedings for nearly forty-five years. Under the former 8 C.F.R. § 242.23, an alien subject to a reinstatement order was entitled to a hearing before an immigration judge, who was charged with determining the identity of the alien, whether the alien had previously been deported, and whether the alien illegally reentered the United States. 8 C.F.R. § 242.23 (repealed 1997). At the hearing before the immigration judge, the alien had the opportunity to contest the charges and evidence, present his or her own evidence, and apply for relief from deportation. Id. The alien was also afforded the right to appeal an adverse decision to the Board of Immigration Appeals and ultimately to the federal courts of appeal. *706 Castro-Cortez v. INS, 239 F.3d 1037, 1044 (9th Cir.2001).
All of that changed in 1997, when the Attorney General made a complete course reversal. Under the new regulation, aliens are to be removed from the country without a hearing or an opportunity to contest the charges, via reinstatement by a low-level Department of Homeland Security employee who serves as both prosecutor and judge.
The central question in this case is whether the Immigration and Naturalization Act (“INA”) permits the Attorney General to make these changes, eliminating longstanding procedural protections. Because the INA unambiguously prohibits the Attorney General from creating alternative procedures for any inadmissibility or deportability determinations absent explicit congressional permission and because the creation of less-protective procedural mechanisms raises serious constitutional questions, I respectfully dissent from the majority’s decision to uphold the Attorney General’s regulation.[1]
I
As the majority and I agree, the appropriate framework for assessing the validity of 8 C.F.R. § 241.8 is dictated by Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under Chevron, we must consider first “whether Congress has directly spoken to the precise question at issue.” Id. at 842, 104 S.Ct. 2778. “If Congress has done so, the inquiry is at an end; the court ‘must give effect to the unambiguously expressed intent of Congress.’ ” Food and Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778).
In determining congressional intent, we not only examine the precise statutory section in question but also analyze the provision in the context of the governing statute as a whole, presuming a congressional intent to create a “symmetrical and coherent regulatory scheme.” Id. at 133, 120 S.Ct. 1291 (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). We must also “be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of [significant] economic and political magnitude to an administrative agency.” Id. If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we “must respect the agency’s construction of the statute so long as it is permissible.” Id. at 132, 120 S.Ct. 1291 (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)).
Ultimately, “the judiciary is the final authority” in interpreting statutes, and courts must employ all “traditional tools of statutory construction” under Chevron step one to ascertain whether Congress’s intent is “clear.” Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. In this case, the text and structure of the INA are clear; the statute unambiguously prohibits the Attorney General’s interpretation. But even if the statute were ambiguous, the Attorney General’s interpretation would be precluded by the canon of constitutional avoidance — unquestionably a “traditional tool of statutory construction” to be used at Chevron step one — pursuant to which we must presume that Congress did not intend to permit any interpretation that, like the Attorney General’s, raises serious constitutional questions.
*707 II
The intent of Congress could hardly be clearer. The text and structure of the INA unambiguously require that inadmissibility and deportability determinations be made by an immigration judge pursuant to the procedural protections outlined in INA § 240. Section 240 declares that the procedural mechanism it creates “shall be the sole and exclusive procedure for determining” an alien’s removability, unless Congress has “specified” an alternative procedure. INA § 240(a)(3); 8 U.S.C. § 1229a(a)(3). This language leaves no room for quarreling. Unless Congress explicitly creates a new procedural mechanism, the § 240 procedure must be followed in any and all “removal proceedings.” INA § 240(a)(1); 8 U.S.C. § 1229a(a)(l). Because reinstatement proceedings determine the admissibility of aliens and because the reinstatement provision contains no explicit procedural exception, it is clear that § 241(a)(5) proceedings must employ the required § 240 mechanism.
Although the statute’s plain language should settle the question, it is worth noting that this construction is buttressed by the INA’s inclusion of several provisions that do explicitly create or authorize alternative procedural mechanisms, demonstrating that Congress knew how to express an intention to deviate from § 240 and failed to do so in § 241(a)(5). See, e.g., INA § 235(b)(1) (expedited removal for arriving and certain other aliens); INA § 235(c) (expedited removal for terrorists); INA § 238 (administrative removal for nonpermanent residents convicted of an aggravated felony). The existence of these explicit provisions has considerable significance in discerning Congress’s intent. See Valderrama-Fonseca v. INS, 116 F.3d 853, 856 & n. 6 (9th Cir.1997) (noting in relation to IIRIRA § 348 that “it is apparent that Congress knew how to make provisions of IIRIRA applicable to pending proceedings when it wanted to”).
In short, § 240 requires an explicit exemption before expedited procedures may be used, and § 241(a)(5) contains no such exemption. Thus, because 8 C.F.R. § 241.8 goes beyond the authority of the INA by eliminating the express and exclusive authority of immigration judges to determine whether an alien’s prior deportation order should be reinstated under INA § 241(a)(5), the regulation is ultra vires to INA § 240(a). See Romero v. INS, 39 F.3d 977, 979-81 (9th Cir.1994).
Despite these unambiguous statutory requirements, the majority concludes that reinstatement proceedings need not follow § 240 strictures. The majority holds that the reinstatement provision authorizes the Attorney General’s less-protective procedural mechanism just by implying a preference for shorter proceedings. But this analysis violates the very statute it purports to interpret. The INA does not tolerate implied authorizations; it requires Congress to “specify” an intention to deviate from § 240 guarantees. INA § 240(a)(3) (“Unless otherwise specified in this Act, a proceeding'under this section shall be the sole and exclusive procedure” for removal.) (emphasis added).
The majority, of course, does not rest entirely on its assertion of implied repeal; it also argues that reinstatement proceedings are not “removal proceedings” and that they therefore do not fall within the ambit of § 240. However, reading the reinstatement provision both on its face and in its context, “with a view to [its] place in the overall statutory scheme,” Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), it is evident that § 241(a)(5) is not an alternative to § 240; rather, a § 241(a)(5) reinstatement order may issue *708 only after a § 240 determination has been made that the alien is removable. The reinstatement provision does nothing to change the fact that illegally reentering aliens fall squarely within the category of “removable” aliens entitled to § 240 procedural guarantees. Section 240(e)(2) defines “removable” aliens as all those that are “inadmissible under section 212” or “deportable under section 237.” One of the enumerated grounds for inadmissibility under § 212 is illegal reentry; it covers aliens who have “been ordered removed” and have “enter[ed] or attempt[ed] to reenter the United States without being admitted.”[2] INA § 212(a)(9)(C)©; 8 U.S.C. § 1182(a) (9)(C)(i). By enumerating illegal reentry as a ground for inadmissibility and by specifying that all inadmissible aliens are “removable” within the meaning of § 240, the INA expressly provides for the removal of illegally reentering aliens pursuant to ordinary § 240 procedures.
Importantly, § 212(a)(9)(C)© also specifically anticipates reentry after a formal removal order, meaning that the provision covers exactly the same group of aliens that the reinstatement provision covers. It is therefore simply not true that “rein-stateable” aliens constitute a separate category from “removable” aliens. The so-called “first-instance” removal provisions, namely §§ 240 and 212, expressly cover the same aliens that the reinstatement provision covers.
This dual coverage need not render either provision surplusage nor need it imply that an alien subject to reinstatement is entitled to precisely the same rights as an alien facing removal for the first time. As many courts have made clear, the reinstatement provision strips illegally reentering aliens of discrete rights that are granted to first time removable aliens, including the rights to “relief, reopening, [and] review.” De Sandoval v. U.S. Att’y Gen., 440 F.3d 1276, 1281 (11th Cir.2006). The majority is also correct to note that § 241(a)(5) narrows the substantive inquiry that must be made prior to determining the alien’s status. Additionally, the reinstatement provision creates a new kind of order to be entered at the end of a § 240 proceeding: an immediately-executing reinstatement order. The reinstatement provision, therefore, has real effects on the rights of reentering aliens and on the consequences of a reinstatement determination. But it does not — and cannot be read to — authorize abrogation of the procedural guarantees mandated by § 240. The rights-stripping provisions in § 241(a)(5) do not conflict with any § 240 procedures; the reinstatement provision can be given full effect without undermining § 240 exclusivity.
In short, the only way to give effect to both §§ 240 and 241(a)(5), especially taking into consideration the express inclusion of reentering aliens in the category of “removable” aliens, is to require that a reinstatement order issue only after a full § 240 hearing before an immigration judge. See Bowsher v. Merck & Co., Inc., 460 U.S. 824, 833, 103 S.Ct. 1587, 75 L.Ed.2d 580 (1983) (restating and reaffirming “the settled principle of statutory construction that we must give effect, if possi *709 ble, to every word of the statute”); FTC v. Mandel Brothers, Inc., 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959) (holding that statutes should be interpreted so as to “fit, if possible, all parts into an harmonious whole”).
The majority finds additional justification for reading § 241(a)(5) as authorizing a deviation from § 240 requirements in the fact that the reinstatement provision mentions the Attorney General rather than immigration judges, allegedly indicating a differential delegation of discretion. However, the Attorney General is merely a titular decision-maker, an example of statutory synecdoche, using the head of the Department of Justice to refer to all of its employees. Countless provisions of the INA refer to determinations of “the Attorney General” even when those determinations will actually be made by lower-level employees and even when those determinations must actually be made by immigration judges pursuant to § 240 procedures. For example, the statutory provision outlining grounds of inadmissibility, INA § 212, contains several references to findings of the Attorney General even though § 240 unquestionably requires that immigration judges make inadmissibility determinations. See, e.g., INA § 212(a)(2)(C) (deeming inadmissible any alien whom “the Attorney General knows or has reason to believe” is a drug trafficker or a drug trafficker’s spouse); INA § 212(a)(2)(H)(i) (any alien whom “the Attorney General knows or has reason to believe” is a human trafficker); § 212(a)(2)(I) (any alien whom “the Attorney General knows, or has reason to believe” is a money launderer); § 212(a)(3)(A) (any alien whom “the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States” as a spy); § 212(a)(3)(B)(i)(II) (any alien whom “the Attorney General ... knows, or has reasonable ground to believe” is an active terrorist); § 212(a)(4)(A) (any alien who “in the opinion of the Attorney General at the time of application for admission or adjustment of status” is likely to become a “public charge”). These provisions might authorize the Attorney General to promulgate regulations clarifying the burden of proof or the evidence that is admissible, but they certainly do not affect the § 240 requirement that inadmissibility determinations be made by immigration judges.
The majority additionally claims that the mention of immigration judges in § 240 “suggests Congress knew how to mandate a hearing before an immigration judge, but chose not to do so in the context of reinstatement orders.” Maj. Op. at 697 (quoting De Sandoval, 440 F.3d at 1281). This argument begs the question. The point is that Congress did not believe itself to be mandating or authorizing any kind of hearing whatsoever; section 241(a)(5) is a substantive provision that leaves § 240 hearing requirements entirely intact.
Although the majority is right to assert that § 241(a)(5) indicates a desire to shorten proceedings for illegally reentering aliens, it is wrong to conclude that the reinstatement provision authorizes a deviation from § 240 procedural guarantees. Section 241(a)(5) streamlines reinstatement proceedings by stripping reentering aliens of a discrete set of rights, not by authorizing an expedited procedural mechanism. Considering the text of the reinstatement provision and its context in the statutory scheme, it is clear that § 241(a)(5) authorizes reinstatement orders to issue only after an immigration judge makes a § 240 determination that the alien is “removable.”
In sum, Congress has expressed its unambiguous intent that the procedural mechanisms it created in § 240 “shall be *710 the sole and exclusive procedure for determining” an alien’s removability. Because the Attorney General’s regulation establishes procedures that conflict with the express provisions of the INA, it cannot stand. See Bona v. Gonzales, 425 F.3d 663, 670-71 (9th Cir.2005) (holding that a regulation that is contrary to statute is invalid).
Ill
Even if the text and structure of the INA were sufficiently ambiguous to leave some discretion to the Attorney General, the canon of constitutional avoidance would preclude the interpretation that the Attorney General chose.
A
The avoidance canon instructs courts to reject those “plausible statutory constructions” that “would raise a multitude of constitutional problems,” Clark v. Martinez, 543 U.S. 371, 380-81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005), as long as an alternative construction exists that is “fairly possible” and less troubling, Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). The canon rests not only on courts’ desire “to avoid the decision of constitutional questions” but also on a “reasonable presumption that Congress did not intend the alternative which raises constitutional doubts.” Clark, 543 U.S. at 381, 125 S.Ct. 716. Avoidance, then, is a “means of giving effect to congressional intent,” id. at 381-82, 125 S.Ct. 716, resting on an assumption that, between two plausible statutory constructions, Congress meant the one that does not approach the boundaries of “constitutionally protected liberties,” DeBartolo, 485 U.S. at 575, 108 S.Ct. 1392. In short, the avoidance canon rests on a judicial presumption that Congress always intends to steer clear of constitutional boundaries.
For purposes of this case, two important conclusions flow from the avoidance canon’s rationales: first, the canon is highly relevant at Chevron step one, and second, the canon does not ultimately depend on the merits of implicated constitutional claims.
Because the avoidance canon centers on a presumption about congressional intent, it certainly pertains to the step one determination of whether Congress intended to preclude the agency’s interpretation. See Brown & Williamson, 529 U.S. at 126, 120 S.Ct. 1291 (denying deference at step one, not because the statute was entirely clear, but because “Congress ha[d] clearly precluded” the agency’s construction); MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (holding that an agency’s interpretation should be denied deference at step one, even in the face of some ambiguity, if the proffered interpretation “goes beyond the meaning that the statute can bear”); Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 574, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (holding that an interpretation should be denied deference at step one if it is “clearly contrary to the intent of Congress”); INS v. Cardoza-Fonseca, 480 U.S. 421, 448 n. 31, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (denying deference at step one, even while noting that the provision contained significant ambiguities, on the ground that the statute clearly precluded the agency’s interpretation).
The avoidance canon, thus, is properly applied at step one of the Chevron analysis. While the majority may be correct that the avoidance canon cannot be used to render an agency’s interpretation “unreasonable” at Chevron step two, the canon is unquestionably a “traditional tool of statutory interpretation” that may and should *711 be used to determine whether Congress intended to preclude the agency’s chosen interpretation. See, e.g., Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng’rs, 581 U.S. 159, 172-73, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (denying deference because the agency’s interpretation “needlessly” raised serious “constitutional issues” and because the Court assumed “that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority”); DeBartolo, 485 U.S. at 575, 108 S.Ct. 1392 (rejecting an agency’s interpretation at step one because it raised “serious constitutional problems”); see also Lattab v. Ashcroft, 384 F.3d 8, 20 n.5 (1st Cir.2004) (specifically reserving the question of whether “the rule of avoidance” would “lead to a different statutory construction” if it were applied “under the first step of Chevron ”).
The second conclusion to flow from the avoidance canon’s rationales is that its application does not depend on this or any court’s conclusions as to the merits of implicated constitutional claims. Clark, 543 U.S. at 381, 125 S.Ct. 716 (“The canon is not a method of adjudicating constitutional questions by other means.”) (citing Adrian Vermeule, Saving Constructions, 85 Geo. L.J.1945, 1960-61 (1997) (listing cases in which the Supreme Court used the canon to avoid a constitutional question only later to decide that the avoided application was not unconstitutional)). Even if every constitutional challenge to arise under the Attorney General’s regulation were ultimately decided against the alien, the regulation should be rejected under the avoidance canon if it approaches “the constitutional danger zone” without a clear statement from Congress that it intended to do so. Vermeule, 85 Geo. L.J. at 1960.
B
That the reinstatement regulation does, in fact, approach the “constitutional danger zone” is beyond cavil. We have noted specifically on more than one occasion that 8 C.F.R. § 241.8 “raises very serious due process concerns[.]” Castro-Cortez v. INS, 239 F.3d 1037, 1048 (9th Cir.2001), abrogated on other grounds by Fernandez-Vargas v. Gonzales, — U.S.-, 126 S.Ct. 2422, 2427 & n. 5, 165 L.Ed.2d 323 (2006). See also Aguilar-Garcia v. Ridge, 90 Fed.Appx. 220, 220 (9th Cir.2004); Arreola-Arreola v. Ashcroft, 383 F.3d 956, 959 (9th Cir.2004).
And several of our sister circuits have expressed similar doubts as to the sufficiency of process afforded. See Lattab, 384 F.3d at 21 n. 6 (noting the seriousness of the constitutional claim given that the regulation “offers virtually no procedural protections”); United States v. Charleswell, 456 F.3d 347, 356 n. 10 (3d Cir.2006) (noting that constitutional doubts relating to the regulation “continue to cause a significant amount of consternation”); Bejja-ni v. INS, 271 F.3d 670, 687 (6th Cir.2002) (construing the regulation as having no retroactive effect in part “to avoid a constitutional question”), abrogated on other grounds by Fernandez-Vargas, 126 S.Ct. at 2427 & n. 5; Gomez-Chavez v. Perry-man, 308 F.3d 796, 802 (7th Cir.2002) (reserving the question of “what kind of procedures” would be “necessary” for an alien who challenges the factual basis for reinstatement); Alvarez-Portillo v. Ashcroft, 280 F.3d 858, 867 (8th Cir.2002) (noting that additional procedures might be due for an alien who challenges the applicability of reinstatement), abrogated on other grounds by Fernandez-Vargas, 126 S.Ct. at 2427 & n. 5.
When we examine the reinstatement procedures more closely, the constitutional concerns expressed by our court and others become apparent. It is well-settled *712 that the due process clause of the Fifth Amendment applies to aliens in removal proceedings. Arreola, 383 F.3d at 962; United States v. Nicholas-Armenta, 763 F.2d 1089, 1090 (9th Cir.1985). Due process requires “a full and fair hearing of[the alien’s] claims and a reasonable opportunity to present evidence on his behalf.” Sal-gado-Diaz v. Gonzales, 395 F.3d 1158, 1162 (9th Cir.2005) (internal quotation marks omitted). Here, both on a facial and as-applied examination, the reinstatement process is well within the constitutional danger zone.
1
First, purely on a facial analysis, the reinstatement process itself approaches the “constitutional danger zone” because it does not provide any opportunity for the alien to challenge the legality of a prior removal order. The inquiry is confined to three determinations: (1) the identity of the alien, (2) that the alien has previously been deported, and (3) that the alien illegally reentered the United States. 8 C.F.R. § 241.8. Thus, an alien that previously has been removed in absentia and without due process has no means of raising his due process claim.
Even as to the three factual determinations to be made, the Attorney General’s reinstatement procedure affords insufficient procedural protections, clearly approaching — if not breaching — the constitutional danger zone. The reinstatement procedure does not provide adequate means to contest the predicates to reinstatement. As we observed in Castro-Cortez, “an alien cannot receive a full and fair hearing unless he has the right to place information into the administrative record.” 239 F.3d at 1049. Under the regulation, however, the alien is afforded the ability only to make “a written or oral statement contesting the determination” to the officer who has already decided to reinstate the order. 8 C.F.R. § 241.8(a)(3). Thus, if an alien wishes to contest the fact that he was previously deported or that his reentry was illegal, he is not permitted to do so with any extrinsic evidence. Under the reinstatement regulation, the alien has no right to introduce documents or other evidence to be considered by the officer; the officer alone determines what will constitute the administrative record. Furthermore, the alien has no right to a hearing at which he or she could call witnesses to testify, and the alien is not afforded the right to review the immigration file upon which the charges are based or to confront the evidence assembled by the government in support of reinstatement.
The lack of due process in practice is illustrated by the reinstatement cases that have found their way to the courts of appeal. In the typical reinstatement case considered by our circuit and our sister circuits, the alien has married a United States citizen and makes an appointment with the agency to discuss adjustment of status or an extension of a previously granted work authorization. During the discussion, the officer serves a Notice to Reinstate Prior Order and asks the alien to fill out the form, which includes a check-box to indicate whether the alien wishes to make a statement. If the box is checked “no,” that is the end of the matter, and the reinstatement is effected without further ado. If the box is checked “yes,” either the alien writes out a statement, or the officer asks questions and writes down the answers. Then the reinstatement is effected, and the alien usually is immediately taken into custody.[3] This procedure can *713 not be said to comport with the requirements of notice and a hearing before a person is deprived of liberty. Mathews v. Eldridge, 424 U.S. 819, 383, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The very real and practical consequence of the Attorney General’s decision is that families in the United States are broken apart, with the father or mother summarily removed from the country without any opportunity to contest the government’s charges.
In short, the regulatory procedure is so streamlined that it deprives reentering aliens of any meaningful opportunity to raise potentially viable legal, constitutional, or factual challenges to their removability. Based on these observations, it is clear that the reinstatement process implemented by 8 C.F.R. § 241.8 falls within the constitutional danger zone.
2
When one specifically examines whether due process has been afforded to Morales in this case, one can only conclude that the procedures as applied to him place him within the constitutional danger zone.
First, the due process problems inherent in the reinstatement process affected Morales. He appeared at his interview for adjustment of status. Without prior notice, he was presented with a Notice of Intent to Reinstate Prior Order. He was not afforded a lawyer. Although he stated that he did not read or write English and needed to have things explained in Spanish *714 in words he could understand, he was not afforded an interpreter. According to the agent’s notes, Morales stated that he had never been before an immigration judge, that he was never informed that he was deported in absentia, and that the signature on the notice card was not his. He was not afforded an opportunity to examine the immigration file that served as the basis for the reinstatement. Rather, despite the fact that he contested the factual predicate for a reinstatement order to issue, he was immediately arrested and taken into custody after he finished answering the officer’s questions. Thus, in his case, the facial due process concerns with the reinstatement procedure were not merely theoretical; he experienced them. He was not given the opportunity to contest the factual basis for the reinstatement, even though he vigorously disputed it. The procedures utilized in Morales’ reinstatement hearing place him within the constitutional danger zone.
Second, because he was deported in ab-sentia, Morales has never seen an immigration judge at all. He never had a full hearing on his prior deportation charges. Therefore, his situation is different from that involved in Arreola-Arreola, in which we concluded that the alien had received due process in his prior deportation hearing.
If Morales’s allegations are true — that he never received notice of the deportation hearing at which he was deported in ab-sentia — then there can be no question that he has been denied a full and fair hearing of his claims; he was, in fact, denied any hearing at all. See Colmenar, 210 F.3d at 971 (holding that an asylum petitioner was denied a full and fair hearing and a reasonable opportunity to present evidence on his behalf where the IJ “acted as a partisan adjudicator” during petitioner’s hearing). Thus, the procedures used in the underlying deportation hearing independently place Morales within the constitutional danger zone.[4]
3
Because the reinstatement procedures fall within the constitutional danger zone, both facially and as applied to Morales, the doctrine of constitutional avoidance requires a presumption that Congress intended to afford Morales a full § 240 hearing before an immigration judge. This statutory construction, which is consistent with the plain words of § 240 and with the overall structure of the INA, necessarily means that the reinstatement regulation is ultra vires to the statute and must be invalidated.
C
Rather than reaching the question of whether there has been a deprivation of due process, the majority opinion contends that any such violation can be addressed and remedied by the court on a petition for habeas corpus, filed by the alien following removal. This contention, however, cannot be squared with the Real ID Act of 2005’s limitation on the availability of habeas re *715 view.[5] In fact, the majority’s suggestion highlights a second “constitutional danger zone” that the reinstatement provision approaches: the Suspension Clause.
Section 106(a) of the Real ID Act, Pub.L. No. 109-13 (May 11, 2005), amending 8 U.S.C. § 1252(D)(5), provides:
Notwithstanding any other provision of law, ... or any other habeas corpus provision, ... a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of [the INA].
“The [Real ID Act] eliminated habeas jurisdiction ... over final orders of deportation, exclusion, or removal.” Alvarez-Ba-rajas v. Gonzales, 418 F.3d 1050, 1052 (9th Cir.2005). Without § 240 procedural protections during the reinstatement proceeding, this lack of post-removal habeas review raises serious Suspension Clause concerns. The Attorney General’s regulation, thus, approaches a second and independent “constitutional danger zone” by denying reinstateable aliens any constitutionally sufficient access to relief from detention and deportation.
When there are essential disputed factual issues, the only constitutionally adequate remedy is a “full and fair hearing,” which includes “a reasonable opportunity [for the alien] to present evidence on his behalf.” Ibarra-Flores v. Gonzales, 439 F.3d 614, 620 (9th Cir.2006) (internal quotation marks omitted). Because the Real ID Act vests exclusive habeas corpus jurisdiction over final orders of removal in the courts of appeal, the statute necessarily deprives the alien of a contested evidentia-ry hearing with a resolution that is later subject to appellate review based on a complete record. Courts of appeal are not trial courts. Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1237 (11th Cir.2006) (“[I]t is not the role of appellate courts to make findings of fact.”); see also Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) (noting that it was improper for a court of appeals to make “factual findings on its own”). In short, under the Real ID Act, evidentiary hearings in habe-as corpus review of final orders of removal are eliminated. Thus, without a hearing before an IJ, Morales will have no opportunity to litigate the contested questions of fact. Even if habeas review were afforded in the appellate courts, it would not be constitutionally sufficient because it would not include an evidentiary hearing at which Morales could participate.
In addition, even if a full post-removal evidentiary hearing were permitted, Morales would be unable to attend and present live testimony without committing the criminal act of reentering the United States after removal, in violation 8 U.S.C. § 1326(a).
In short, the theoretical existence of a post-removal habeas corpus remedy does not provide an opportunity for a full and fair hearing of Morales’s claims before a neutral fact-finder. Morales will never have a hearing on his claims. The only *716 method of avoiding this constitutionally problematic result is to enforce the proper construction of the statute, requiring that reinstatement proceedings be governed by § 240 procedures.
D
Given all of these considerations, even if the statutory language were susceptible to another interpretation, the canon of constitutional avoidance would require us to construe the statute to avoid these many constitutional concerns, interpreting it instead as requiring that § 240 procedures be applicable to reinstatement proceedings. That construction is at least “fairly possible,” Crowell, 285 U.S. at 62, 52 S.Ct. 285, even if not textually and structurally required, and that construction would avoid the plethora of due process and Suspension Clause problems that are inherent in the Attorney General’s regulation.
IV
Congress could hardly have been more clear. The INA unambiguously requires that inadmissibility and deportability determinations be made by an immigration judge pursuant to the procedural protections outlined in INA § 240. Lest there be any doubt, application of the traditional rules of statutory construction, including the canon of constitutional avoidance, dictate the same conclusion; we should not lightly assume that Congress intended to authorize the Attorney General’s abrogation of so many aliens’ procedural rights. The Attorney General’s action in stripping away the procedural protections that had been in place for nearly forty-five years is in direct conflict with the statute and cannot stand.
For those reasons, I respectfully dissent.

. Because I conclude that the regulation is ultra vires to the statute, I find it unnecessary to reach the question of whether the regulation violates the Due Process Clause.

. Illegally reentering aliens are also "deporta-ble” under INA § 237(a)(1); 8 U.S.C. § 1226a(a)(l), which includes aliens that were "inadmissible” at the time of entry and those that are "present in the United States in violation of” the INA. Under § 212(a)(9), all reentering aliens are "inadmissible,” and under INA § 276; 8 U.S.C. § 1326(a), which makes it a crime to reenter the United States after receiving a formal order of deportation, exclusion, or removal, all reentering aliens are "present in the United States in violation of” the INA.

. See, e.g., Lino v. Gonzales, 467 F.3d 1077 (7th Cir.2006) (alien married to U.S. citizen *713 with three U.S. citizen daughters served with reinstatement notice during interview concerning adjustment of status); Fernandez-Var-gas v. Ashcroft, 394 F.3d 881, 883 (10th Cir. 2005) (alien married to U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); Berrum-Garcia v. Comfort, 390 F.3d 1158, 1161(10th Cir.2004) (alien with U.S. citizen wife served with notice of reinstatement of removal during interview concerning adjustment of status); Lattab, 384 F.3d at 12 (alien married to U.S. citizen with adjustment of status proceedings pending served with reinstatement notice during visit to agency office to renew employment authorization and taken into custody); Perez-Gonzalez v. Ashcroft, 379 F.3d 783, 785-86 (9th Cir.2004) (alien married to U.S. citizen served with reinstatement notice and taken into custody during interview about petition to reapply for admission as predicate to adjustment of status); Flores v. Ashcroft, 354 F.3d 727, 729 (8th Cir.2003) (alien with U.S. citizen husband served with reinstatement notice and taken into custody during adjustment of status interview); Padilla v. Ashcroft, 334 F.3d 921, 923 (9th Cir.2003) (alien married to U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); Gomez-Chavez v. Perry-man, 308 F.3d 796, 799 (7th Cir.2002) (alien married to U.S. citizen with work authorization served with notice to reinstate during interview concerning adjustment of status); Gallo-Alvarez v. Ashcroft, 266 F.3d 1123, 1127 (9th Cir.2001) (alien married to U.S. citizen returns to INS office at suggestion of District Director to renew work authorization, served with Notice to Reinstate Prior Order and taken into custody); Castro-Cortez, 239 F.3d at 1040 (alien [Castro-Cortez] married to U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); id. at 1042 (alien [Funes-Quevado] married to a U.S. citizen served with reinstatement notice during interview concerning adjustment of status and taken into custody); id. at 1042-43 (alien [Rueda] married to a U.S. citizen served with reinstatement notice during interview concerning adjustment of status and arrested); id. at 1043 (alien [Salinas-Sandoval] married to U.S. citizen served with reinstatement notice during visit to agency to inquire about progress on adjustment of status request); see also Wilson v. Gonzales, 471 F.3d 111, 2006 WL 3541717 (2d Cir.2006) (alien business owner married to U.S. citizen served with reinstatement notice during adjustment of status proceedings); Faiz-Mohammad v. Ashcroft, 395 F.3d 799, 801 (7th Cir.2005) (reinstatement notice served during adjustment of status proceedings); Arevalo v. Ashcroft, 344 F.3d 1, 6 (1st Cir.2003) (alien with U.S. citizen children served with reinstatement order during sixth year of adjustment of status proceedings).

. It is, of course, unnecessary in avoidance analysis to determine whether Morales has demonstrated prejudice. Because there is at least a serious possibility that the reinstatement regulations violated Morales's due process rights, those regulations are inconsistent with presumed congressional intent regardless of whether Morales has shown a remediable constitutional violation in his case. Nevertheless, it is worth noting that Morales has shown a significant likelihood of prejudice by contesting both the constitutionality of the initial removal order and the factual basis of the reinstatement order. His inability to present and develop those claims before an immigration judge may well have resulted in an erroneous deportation.

. The majority opinion does not specify that it has habeas relief in mind, but a writ of habeas corpus is the only imaginable remedy that an alien could seek after removal from the country. By the time that a removal order has been executed, motions to reopen and petitions for review would no longer be available. Furthermore, neither a motion to reopen nor a petition for review would allow litigation of a fact-based (or as-applied) substantive constitutional challenge since the agency may not litigate such challenges and the appellate courts may not conduct evidentiary hearings. A removed alien, thus, has absolutely no means of raising an as-applied constitutional challenge to his deportation, particularly after REAL-ID.