**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ERNESTO SALGADO-DIAZ,
                    *Petitioner,*

            v.

ALBERTO R. GONZALES,
Attorney General,*
                    *Respondent.*

No. 02-74187

Agency No.
A74-789-511

ERNESTO SALGADO-DIAZ,
                    *Petitioner,*

            v.

ALBERTO R. GONZALES,
Attorney General,*
                    *Respondent.*

No. 03-73312

Agency No.
A74-789-511

ORDER
GRANTING
IN PART
MOTION FOR
RECONSIDERATION
AND AMENDING
OPINION AND
AMENDED
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 2, 2004—Pasadena, California

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

Filed January 31, 2005
Amended March 10, 2005

Before: A. Wallace Tashima, Raymond C. Fisher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Karen Levine, Levine Law Offices, San Diego, California, for the petitioner.

M. Jocelyn Lopez Wright, Assistant Director, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

**ORDER**

Respondent's request for modification of the court's decision, filed February 14, 2005, is **GRANTED in part.**

The opinion filed at 395 F.3d 1158, 1164 (9th Cir. 2005) is amended as follows:

Replace the sentence:

"If his arrest violated the Fourth Amendment, he would be entitled to suppression of his voluntary departure statement and the INS Form I-213, which was completed after he returned to the United States."

With the following sentence:

"If his arrest involved an egregious violation of his Fourth Amendment rights — such as a stop based solely on his Hispanic appearance — he would be entitled to suppression of his voluntary departure statement and the INS Form I-213, which was completed after he returned to the United States."

**No further petitions shall be entertained.**

---

## OPINION

FISHER, Circuit Judge:

Ernesto Salgado-Diaz comes before us for the second time, petitioning for review of a decision of the Bureau of Immigration Appeals ("BIA") summarily affirming the decision of an Immigration Judge ("IJ") finding him removable. Salgado-Diaz alleges that his due process rights have been violated because he has been repeatedly denied an evidentiary hearing on his allegations that U.S. border patrol agents unlawfully arrested him on the streets of San Diego, California, and took him to Mexico in 1996, even though he was in immigration proceedings at the time. His arrest and expulsion set in motion a series of events that ultimately resulted in Salgado-Diaz losing his opportunity to seek relief under then-existing immigra-

tion laws that likely would have entitled him to suspension of deportation.[1]

If Salgado-Diaz's allegations concerning his arrest and expulsion are true, he would have a substantial claim that his constitutional rights have been violated. Accordingly, we hold that denying him an evidentiary hearing on those allegations is itself — under the circumstances present here — a due process violation. We therefore grant his petition and remand his case to the BIA for an evidentiary hearing on petitioner's arrest and expulsion by border agents and a determination of whether petitioner qualifies for the relief of suspension of deportation.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Salgado-Diaz entered the United States from Mexico without inspection in August 1989. He lived in San Diego with his mother and has a daughter who was born in the United States in September 1996. He has one U.S. citizen sister and two other siblings who are legal permanent residents.

In August 1996, Salgado-Diaz filed for asylum and withholding of deportation. Shortly thereafter, the Immigration and Naturalization Service ("INS") sent him an order to show cause as to why he should not be deported.[2] Petitioner first appeared before an IJ on November 4, 1996.[3] The IJ post-

---

[1]Salgado-Diaz also asserts that the BIA erred in rejecting his ineffective assistance of counsel claim. We do not reach that claim, given our resolution of the due process issue.

[2]The INS has since been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2142 (2002), 6 U.S.C. §§ 101-557. For convenience, we refer to the government agency as the INS.

[3]Immigration Judge Anthony Atenaide presided over all the proceedings throughout the extended process reviewed in this opinion.

poned Salgado-Diaz's hearing until December so his counsel could be present.[4]

Before the scheduled follow-up hearing, however, U.S. Border Patrol agents arrested Salgado-Diaz on November 17, while he was walking on a street in San Diego. He alleges that he was on his way to pick up orange juice from a local store for a family gathering when, merely because he appeared to be Hispanic, the agents stopped him and asked if he had a green card. According to petitioner, he told the agents about his pending immigration hearing, but they ignored him. He was then asked to sign a form, which he understood to be necessary for looking up his pending immigration proceedings. In fact, it was a voluntary departure form. The INS took Salgado-Diaz by bus to Tecate, Mexico.

Six days later, on November 23, Salgado-Diaz attempted to reenter the United States using a fake passport.[5] He claims he thought he was carrying a work permit or other document that could be used to cross the border lawfully. The INS took Salgado-Diaz into custody when he produced the fake document.

After Salgado-Diaz's attempted reentry, the INS moved in December 1996 to terminate the still-pending deportation proceedings so that it could bring exclusion proceedings against him instead. Concerned that he now faced more serious charges against him with less likelihood of relief, petitioner opposed the termination of deportation proceedings — arguing that he did not voluntarily depart the United States but instead was coerced into leaving the country. The INS

---

[4]Salgado-Diaz told the IJ in November he had an attorney but could not remember the name of the attorney, who was not present. Because the attorney suffered a heart attack and was unable to attend the December hearing, it was continued into January.

[5]Petitioner ostensibly had counsel, although counsel may not have been available to him at this time.

responded by requesting an evidentiary hearing, which it believed necessary for the IJ "to correctly rule on the issue of termination."

At a hearing on January 9, 1997, the IJ terminated deportation proceedings against Salgado-Diaz, clearing the way for the INS to institute the more stringent exclusion proceedings against him. The IJ — plainly troubled by petitioner's circumstances and the allegations of government misconduct — did not conduct an evidentiary hearing to resolve the disputed issue of whether petitioner was unlawfully arrested by border patrol agents and forced to depart the country. Rather, the IJ concluded that the issue, including any "possible Service misconduct," would have to be litigated in the exclusion proceeding. The IJ made explicit that terminating the deportation proceedings did not mean he was deciding or "condoning what the Service officers may or may not have done in this case."

The IJ acknowledged that petitioner could be disadvantaged if the INS did not initiate the exclusion proceedings before April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, which worked major changes in the immigration laws that would be unfavorable to someone in Salgado-Diaz's circumstances. But the IJ also suggested that Salgado-Diaz could seek relief on appeal from any prejudice caused by terminating the old proceedings if the new proceedings did not begin until after April 1, 1997. "[You can] [p]ut all of that into the appeal, say you know, the Service prejudiced my client by doing all of these things. . . . [If Salgado-Diaz] is denied suspension after that, you got a whole bunch of ways to appeal."

Salgado-Diaz appealed to the BIA, asserting that the IJ violated his due process rights by terminating deportation proceedings without a full and fair hearing on his claim for relief. Specifically, he argued he was not given the chance to estab-

lish facts about his forced removal and the INS border agents' knowledge that he was already in deportation proceedings at the time. Salgado-Diaz also urged that the INS, based on its affirmative misconduct, should be estopped from relying on his illegal reentry.

The BIA, in June 1998, affirmed the IJ's decision. The Board held that based on the record before it, and "absent the testimony or affidavit of the arresting officers," it could not conclude that the agents who arrested Salgado-Diaz coerced him into signing voluntary return documents or that the INS should be estopped. The Board did not address petitioner's claim that he was denied a fair hearing.

Salgado-Diaz appealed the BIA's decision to this court, asking that we consider his claim "that he should be in deportation rather than exclusion proceedings because he was improperly and illegally removed from the country." *Salgado v. INS*, No. 98-70823, 2000 WL 569505,*1 (9th Cir. 2000) (unpublished disposition). In its responsive brief, the INS asserted that the allegations raised by Salgado-Diaz are "issues of fact [that] are properly resolved in an evidentiary exclusion hearing." The INS also stated that if the facts demonstrated that border agents had arrested petitioner unlawfully, Salgado-Diaz could still apply for relief from deportation.

Concluding that the IJ's decision to terminate deportation proceedings in favor of an exclusion proceeding was not a final order of deportation or exclusion, we dismissed for lack of jurisdiction. *Id.* However, we expressly noted that the INS had represented that Salgado-Diaz "may litigate his claims regarding the legality of his departure, as well as litigate the question of whether he is properly in exclusion or deportation, at an exclusion hearing." *Id.*

Meanwhile, the INS had on June 12, 1997, instituted new proceedings against Salgado-Diaz. Although the INS had con-

templated that petitioner would be placed in exclusion proceedings, IIRIRA eliminated the distinction between deportation and exclusion proceedings, replacing them with a new, consolidated category — "removal." Thus, when the INS instituted new charges against petitioner, it was in the form of a notice to appear for removal proceedings.

At subsequent removal hearings before the IJ, petitioner continued to press for an evidentiary hearing on whether the border agents in San Diego had unconstitutionally arrested him and forced him out of the country, interfering with his pending deportation hearing. In November 2000, Salgado-Diaz moved to suppress any direct or indirect evidence resulting from the arrest.

At a December 2000 hearing, the IJ initially agreed that Salgado-Diaz should have a hearing on his suppression motion. But at petitioner's later and final immigration hearing in July 2001, the IJ changed his mind and limited the evidentiary hearing to whether any coercion took place *after* Salgado-Diaz attempted to reenter the country with his fake passport, not the circumstances of petitioner's San Diego arrest and expulsion. The IJ read the BIA's decision as foreclosing the latter issues, leaving only issues related to his reentry open to dispute — even though this was not the focus of petitioner's motion to suppress. The IJ concluded that INS agents did not engage in any unlawful conduct when Salgado-Diaz reentered the country and ordered him removed. The BIA summarily affirmed and subsequently denied his motion to reopen. He timely petitioned this court for review. We have jurisdiction under 8 U.S.C. § 1252.

## II. STANDARD OF REVIEW

We review de novo due process challenges to final orders of deportation. *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000).

## III. DISCUSSION

### A. Due Process Violation

**[1]** Immigration proceedings, although not subject to the full range of constitutional protections, must conform to the Fifth Amendment's requirement of due process. *United States v. Nicholas-Armenta*, 763 F.2d 1089, 1090 (9th Cir. 1985). Salgado-Diaz can establish a due process violation by showing that he was denied "a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." *Colmenar*, 210 F.3d at 971 (holding that petitioner's due process rights were violated when the IJ prevented a full examination of petitioner during hearing); *see Castillo-Villagra v. INS*, 972 F.2d 1017, 1029 (9th Cir. 1992) (holding that the BIA's failure to provide petitioners an opportunity to rebut noticed facts violated due process). Additionally, Salgado-Diaz must demonstrate that he was prejudiced by the violation. *See Colmenar*, 210 F.3d at 971.

**[2]** We hold that failing to afford petitioner an evidentiary hearing on his serious allegations of having been unlawfully stopped and expelled from the United States, aborting his pending immigration proceedings and the relief available to him at the time, violated his right to due process of law.

### 1. Full and fair hearing

**[3]** Salgado-Diaz has established one possible and one actual denial of a full and fair hearing. The first, possible denial allegedly occurred in November 1996, when he was in the midst of the very statutory process Congress had established to permit an alien in his position to regularize his residency in the United States. If petitioner is to be believed, INS border agents appear to have stopped and arrested him in violation of the Fourth Amendment.**[6]** *See Gonzalez-Rivera v.*

---

**[6]**We emphasize that we do not reach any conclusions as to the truth of Salgado-Diaz's allegations concerning his San Diego arrest and deportation, the facts of which are to be addressed in an evidentiary hearing.

*INS*, 22 F.3d 1441, 1446-48 (9th Cir. 1994) (holding that border officers violated the Fourth Amendment rights of defendant by stopping him because of his Hispanic appearance, thereby triggering exclusionary rule in a civil proceeding). The border agents then removed him from the country without any of the procedural safeguards of a formal hearing. *See Hernandez-Luis v. INS*, 869 F.2d 496, 498 n.2 (9th Cir. 1989) (noting that formal deportation proceedings are required unless a nonresident admits to being deportable and voluntarily departs from the United States).

**[4]** Petitioner has repeatedly asserted that he did not agree to leave the country voluntarily and signed the departure form only because he thought it was needed to look up his pending case. He distinguishes his circumstances from cases in which nonresidents have accepted voluntary departure as the "lesser of two evils" when faced with the threat of the INS instituting deportation proceedings. *See, e.g., Vasquez-Lopez v. Ashcroft*, 343 F.3d 961, 970 (9th Cir. 2003). In contrast, at the time of Salgado-Diaz's stop, the INS already had initiated proceedings against him — after he sought asylum — and he had open to him the possibility of *relief* from deportation. Even if the agents were justified in taking him into custody, according to petitioner they still deliberately ignored his plea that he was in the midst of a pending proceeding. If Salgado-Diaz's allegations are true, the unlawful arrest and removal denied him his day in court, substituting a peremptory deportation for a considered immigration court judgment as to whether Salgado-Diaz qualified to remain in the United States with his family.

**[5]** The other denial of a fair hearing — which petitioner has in fact established — arises out of the repeated failures to grant Salgado-Diaz the evidentiary hearing to determine whether or not the INS border agents really did act improperly, either by unconstitutionally stopping and arresting him or by expelling him from the country while he was in deportation proceedings. The INS itself — fully aware of the sub-

stance of Salgado-Diaz's claim — has from the beginning argued that an evidentiary hearing was necessary to resolve his allegations of misconduct. Yet through a series of twists and turns, that hearing has never come to pass — even though this court was led to believe such a hearing was going to be part of the process following our dismissal of Salgado-Diaz's first appeal. The failure to hear evidence on Salgado-Diaz's arrest and alleged forced removal from the country deprived him of a reasonable opportunity to present his case, violating his due process right to a full and fair hearing.

### 2. *Prejudice*

**[6]** Salgado-Diaz must also establish prejudice by showing his rights were violated "in a manner so as potentially to affect the outcome of the proceedings." *Campos-Sanchez v. INS,* 164 F.3d 448, 450 (9th Cir. 1999) (internal quotations and citations omitted). Clearly, Salgado-Diaz's arrest and expulsion had a prejudicial impact on his underlying immigration proceedings. The agents' conduct ultimately prevented him from seeking the type of relief from deportation for which he was eligible before his arrest and expulsion. Had petitioner been given an evidentiary hearing, he might have established that the INS border agents' conduct was indeed unconstitutional either under the Fourth Amendment or as a matter of due process. If his arrest involved an egregious violation of his Fourth Amendment rights — such as a stop based solely on his Hispanic appearance — he would be entitled to suppression of his voluntary departure statement and the INS Form I-213, which was completed after he returned to the United States. *See Gonzalez-Rivera,* 22 F.3d at 1445-48 (affirming IJ's decision to suppress officer testimony and INS Form I-213 following evidentiary hearing on allegedly unconstitutional stop).

**[7]** Moreover, regardless of his success on the Fourth Amendment claim, had Salgado-Diaz demonstrated that he was involuntarily removed from the country, he would have

shown that his deportation hearing should never have been terminated and that he was improperly placed in a new type of proceeding. In *Mendez v. INS*, we held that "departure" in the immigration context excludes departures illegally executed by the government and in contravention of procedural due process. 563 F.2d 956, 958 (9th Cir. 1977) (citing *Delgadillo v. Carmichael*, 332 U.S. 388 (1947) (holding that a nonresident does not make an "entry" into the United States when he had no intent to "depart," or left involuntarily)). Mendez was a permanent resident alien who had been convicted of burglary, sentenced for one year and ordered deportable under a law that applied to crimes with sentences of one year or more. His state court conviction was later vacated and his sentence reduced to less than a year. When petitioner tried to explain the change to the INS, he was deported anyway without notice to his counsel. *Id.* at 957. We found a violation of petitioner's right to counsel and ordered him admitted to the United States, granting him the same status he had prior to his deportation. *Id.* at 959.

In this case, assuming petitioner had demonstrated that his "deportation" was not voluntary or lawfully executed, Salgado-Diaz would have been returned to his original, pre-arrest status, under conditions favorable to his qualifying for relief from deportation. *See Castillo-Perez v. INS*, 212 F.3d 518, 528 (9th Cir. 2000) (holding that the appropriate remedy for a due process violation in a deportation proceeding was for petitioner to "receive a hearing under the law that applied to him at the time his original hearing occurred"). Thus, the failure of the IJ to hold an evidentiary hearing prejudiced petitioner by denying him the opportunity to show he should never have been taken out of his deportation proceeding.

The INS argues that there is no prejudice, because Salgado-Diaz would not be eligible under IIRIRA for relief in the form of cancellation of removal, and thus his 2001 removal order remains valid. *See* 8 U.S.C. § 1229b(b)(2000) (requiring, *inter alia*, 10 years' physical presence in the United States). The

INS is correct that petitioner would not qualify for relief under IIRIRA's rules, which took effect in April 1997. At the time petitioner received his notice to appear for removal proceedings in June 1997 — the relevant date for calculating physical presence under IIRIRA — Salgado-Diaz had been in the country less than 10 years.

However, but for the allegedly unconstitutional arrest and expulsion from the country, petitioner would have remained in deportation proceedings and would have been eligible for relief under the more favorable immigration laws governing his 1996 deportation proceeding. Under the prior statutory regime, the Attorney General could suspend the deportation of an alien who could demonstrate (1) physical presence in the United States for the seven-year period prior to his application; (2) good moral character during that period; and (3) that his deportation would result in extreme hardship to himself or to his United States citizen or permanent resident spouse, parent or child. 8 U.S.C. § 1254(a)(1)(1994) (repealed by Pub. L. 104-208). By November 1996, Salgado-Diaz had been in the United States more than seven years, had not been convicted of any crimes and had a U.S. citizen daughter.

**[8]** In short, Salgado-Diaz had a fair shot at suspension of deportation but no chance at all once his hearing process recommenced after April 1997 under the new, stricter IIRIRA regime. Thus, Salgado-Diaz has established prejudice stemming from the failure of the IJ to hold an evidentiary hearing on allegations that the INS acted improperly in stopping and removing him when he was already in immigration proceedings.

## B.   *Equitable Estoppel*

The INS argues that Salgado-Diaz's attempt to enter the United States as a nonresident without any legal status and only fake documentation provides an independent and adequate basis for ordering him removable, regardless of whether

he can establish a Fourth Amendment violation or that he was forced to leave the country during his immigration proceeding. Even if the I-213 form can be suppressed, petitioner's alienage and identity demonstrate he was not admissible at the time he presented himself to border officials. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) (holding that the body or identity of a defendant may not be suppressed, "even if it is conceded that an unlawful arrest, search, or interrogation occurred"). Further, the INS urges that even assuming Salgado-Diaz was involuntarily removed from the country, petitioner's decision to seek admission to the United States without a valid visa was of his own volition and in violation of the immigrations laws. Thus, the IJ properly ordered him removable.

We cannot accept what is essentially a bootstrap argument. Salgado-Diaz was placed in the position of seeking to re-enter the United States because of the allegedly unconstitutional stop and improper removal by border agents. Although he may have not had "legal status" at the time of his arrest and expulsion, petitioner was in the midst of a proceeding to determine his status. We conclude that the doctrine of equitable estoppel precludes the INS from relying on the consequences of its own alleged affirmative misconduct to insulate that misconduct from review.

## 1. *Equitable estoppel against the government*

**[9]** The government in immigration cases may be subject to equitable estoppel if it has engaged in affirmative misconduct. *See Mukherjee v. INS*, 793 F.2d 1006, 1008-09 (9th Cir. 1986) (outlining elements of equitable estoppel claim against the government); *Santiago v. INS*, 526 F.2d 488, 492 (9th Cir. 1975) (en banc) (holding in the immigration context that the court continues "to believe that estoppel is available in such cases where the particular facts warrant it") (citing *INS v. Hibi*, 414 U.S. 5, 8 (1973)); *see also Watkins v. United States Army*, 875 F.2d 699, 706-711 (9th Cir. 1989) (en banc) (hold-

ing that equitable estoppel could be invoked against the government where the Army affirmatively misrepresented to defendant over a 14-year period that he was qualified for reenlistment despite an ongoing policy that homosexuality constituted a nonwaivable disqualification for reenlistment); *Fano v. O'Neill*, 806 F.2d 1262, 1265-66 (5th Cir. 1987) (holding that petitioner had adequately stated a claim against the government for affirmative misconduct where he alleged the INS "willfully, wantonly, recklessly, and negligently" delayed in processing his application, suggesting selective treatment). *Cf. Miranda v. INS*, 459 U.S. 14, 19 (1982) (declining to estop the INS from denying permanent resident status to petitioner who lost his eligibility because of the INS's delay, concluding that "[p]roof only that the Government failed to process promptly an application falls far short of establishing" affirmative misconduct). The person seeking estoppel against the government also must show that the potential injustice to him outweighs the possibility of damage to the public interest, and must establish the traditional elements for estoppel. *See Watkins,* 875 F.2d at 707.

**[10]** We conclude that the government should be estopped from relying on Salgado-Diaz's attempted re-entry to remove him, essentially for the same reasons — and to the same extent — that we have found his due process rights have been violated. That is, if petitioner can, in the evidentiary hearing to which we hold he is entitled, prove that the INS deprived him of his right to have his immigration status determined in the pending deportation proceeding, the government cannot rely on the post-expulsion events its own misconduct set in motion. Adding to our assessment of the equities are the INS's representations to this court and petitioner that he would have the opportunity to litigate his claims at an evidentiary hearing and, if successful, seek suspension of deportation relief.

**[11]** We also conclude that estoppel against the government here would not "unduly damage the public interest." *Johnson*

*v. Williford*, 682 F.2d 868, 871 (9th Cir. 1982) (holding that defendant who was mistakenly granted parole by the government but had reintegrated into the community was unlikely to threaten the public interest). In this instance, petitioner already met the criteria for eligibility for suspension of deportation at the time of his expulsion to Mexico. The public interest would not be burdened by allowing Salgado-Diaz to have his claim properly considered as if the events arising out of the government's actions had not occurred.

### 2. *Traditional elements of equitable estoppel*

[12] Salgado-Diaz also must satisfy the traditional elements of equitable estoppel, which require a showing that (1) the party to be estopped knows the facts; (2) the party intends that his or her conduct will be acted on; (3) the claimant must be ignorant of the true facts; (4) and the claimant must detrimentally rely on the other party's conduct. *See Johnson*, 682 F.2d at 872 (holding elements met where the Parole Commission deliberately released defendant, even though he was ineligible for parole).

[13] These four elements are satisfied here, assuming Salgado-Diaz's allegations prove to be true. First, the border agents knew that Salgado-Diaz already was in immigration proceedings at the time he was stopped in San Diego and that he had an upcoming deportation hearing. They also should have known they were violating the Constitution by detaining petitioner solely on the basis of his Hispanic appearance. *Gonzalez-Rivera*, 22 F.3d at 1450 ("The fact that INS officers receive extensive training in Fourth Amendment law . . . also supports the inference that when an INS officer makes a stop based solely on race, he or she has *deliberately violated the law or has acted in conscious disregard* of the Constitution.") (emphasis added). The INS, knowing Salgado's claims about his San Diego arrest and expulsion and the circumstances of his reentry, further told this court on the first appeal — nearly three years after having instituted removal proceedings — that

petitioner would have the opportunity "to litigate his claims regarding the legality of his departure . . . ."

Second, assuming petitioner's claims to be true, the border agents intended the consequences of their actions — they physically removed Salgado-Diaz from San Diego to Mexico, essentially deporting him without a proceeding. For its part, the INS plainly intended that this court and petitioner would act in accordance with the representations it made that Salgado-Diaz would receive a hearing.

Third, Salgado-Diaz did not understand the basis for the border patrol agents stopping or arresting him. He also alleges he did not understand the significance of the documents he was induced to sign, namely that they would lead to his deportation rather than the INS tracking down his pending immigration hearing status. According to Salgado-Diaz, he did attempt to explain he was in proceedings but was arrested and expelled anyway. As for the purported evidentiary hearing, neither this court nor petitioner expected that fact-finding opportunity to be illusory.

Finally, the fourth element is met here, where the INS agents' conduct severely disadvantaged Salgado-Diaz by expelling him to Mexico. The act of taking him out of the country had the effect of changing his immigration status. *See Heckler v. Cmty. Health Serv.*, 467 U.S. 51, 61 (1984) (analyzing detrimental reliance by examining "the manner in which reliance on the government's misconduct has caused the private citizen to change his position for the worse"). Had he not attempted to return to the United States so he could appear at his pending immigration hearing, he may have lost his chance to assert his eligibility for relief from deportation. Further, petitioner detrimentally relied on assertions by the INS that he should and would receive a hearing on his claims.

Our own disposition in the first appeal expressly relied on those assertions.[7]

**[14]** Given the government's role in bringing about petitioner's circumstance — *if* the petitioner proves the alleged affirmative misconduct — the equities strongly weigh in favor of estopping the government from seeking removal based on petitioner's reentry. If his story does not hold up, of course, then the basis for his challenge to the 2001 removal order collapses.

## IV.  CONCLUSION

The petition for review is GRANTED, and we REMAND the case to the BIA with instructions to order an evidentiary hearing before an immigration judge as to the facts relating to Salgado-Diaz's arrest and expulsion by border patrol agents in November 1996. If he establishes that his arrest was unconstitutional, evidence stemming from the arrest, including his voluntary departure and I-213 forms should be suppressed. If Salgado-Diaz demonstrates that he was involuntarily removed from the country during his pending deportation proceedings, then he will have shown that he should never have been placed in exclusion proceedings. In either eventuality, Salgado-Diaz will be entitled to the relief available at the time of his original hearing, including suspension of deportation under former 8 U.S.C. § 1254(a)(1), as if the arrest and expulsion had not occurred. *See Castillo-Perez*, 212 F.3d at 528. Finally, if petitioner establishes in the evidentiary hearing that the border agents engaged in the alleged affirmative miscon-

---

[7]Given the INS's representations in the first appeal and our disposition in light thereof, the law of the case doctrine might also support precluding the INS from relying on Salgado-Diaz's reentry to order him removable. This doctrine provides that our decisions on legal issues — both explicit and implicit— "must be followed in all subsequent proceedings in the same case." *See Bernhardt v. Los Angeles County*, 339 F.3d 920, 924 (9th Cir. 2003) (internal quotations and citations omitted). We need not resolve the issue given our holding on equitable estoppel.

duct, the government will be estopped from relying on his attempted reentry to render him removable.

**PETITION GRANTED.**