**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IVAD MOHAMMED HAMMAD,

　　　　　　　　　*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

　　　　　　　　　*Respondent.*

No. 07-72370

Agency No.
A073-883-390

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 12, 2010—San Francisco, California

Filed April 22, 2010

Before: Alfred T. Goodwin, Marsha S. Berzon and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

**COUNSEL**

Michael P. Karr and Lizbeth A. Galdamez, Law Offices of Michael P. Karr & Associates, Sacramento, California, for petitioner Hammad.

Gregory G. Katsas, Assistant Attorney General, Stephen J. Flynn, Senior Litigation Counsel, Karen Y. Stewart, Attorney, and Ari Nazarov, Attorney, Office of Immigration Litigation, Civil Division, Washington, D.C., for respondent United States.

## OPINION

IKUTA, Circuit Judge:

In 1995, Ivad Mohammed Hammad, a Palestinian immigrant to the United States, was granted permanent resident status on a conditional basis, based on a petition filed by his U.S. citizen wife. His permanent resident status lapsed when his wife admitted to Immigration and Naturalization Service (INS) officials that she had entered into the marriage for a fee, and withdrew her support of his petition to remove the condition on his residency. Now remarried, Hammad appeals a determination by the Board of Immigration Appeals (BIA) that he is not entitled to permanent resident status. Because the BIA's determination was supported by substantial evidence, we deny his petition.

I

Before discussing the facts of this case, we provide a brief overview of the statutory and regulatory framework that allows an alien to obtain legal permanent residency status based on a petition from the alien's U.S. citizen spouse. *See* 8 U.S.C. §§ 1154(a), 1186a.

Under § 1154(a), a U.S. citizen may file a petition with the INS[1] to adjust the status of an alien spouse. An alien with a

---

[1]The INS ceased to exist on March 1, 2003. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. At that time, its functions were transferred to three new agencies within the Department of Homeland Security (DHS). *Id.* We refer to the agency as the INS because the proceedings here were initiated before the transfer.

qualifying marriage to a U.S. citizen is generally granted the status of lawful permanent resident, but maintains this status on a conditional basis for a two-year period. § 1186a(a)(1).[2] At any time before the end of the two-year conditional residency period, the INS may terminate the alien's permanent resident status if it determines that the alien's qualifying marriage is fraudulent, was judicially annulled or terminated, or that a fee or other consideration was paid to the citizen claiming to be a spouse. § 1186a(b)(1);[3] *see In re Stowers*, 22 I. & N. Dec. 605, 609 (BIA 1999). If the alien appeals this termination to the BIA, the burden of proof is on the agency "to establish, by a preponderance of the evidence, that the facts

---

[2]8 U.S.C. § 1186a(a)(1) states: "Notwithstanding any other provision of this chapter, an alien spouse . . . shall be considered, at the time of obtaining the status of an alien lawfully admitted for permanent residence, to have obtained such status on a conditional basis subject to the provisions of this section."

[3]8 U.S.C. § 1186a(b)(1) states:

In the case of an alien with permanent resident status on a conditional basis under subsection (a) of this section, if the Attorney General determines, before the second anniversary of the alien's obtaining the status of lawful admission for permanent residence, that—

(A) the qualifying marriage—

(i) was entered into for the purpose of procuring an alien's admission as an immigrant, or

(ii) has been judicially annulled or terminated, other than through the death of a spouse; or

(B) a fee or other consideration was given (other than a fee or other consideration to an attorney for assistance in preparation of a lawful petition) for the filing of a petition under section [1154(a) of this title] with respect to the alien;

the Attorney General shall so notify the parties involved and, subject to [a hearing], shall terminate the permanent resident status of the alien (or aliens) involved as of the date of the determination.

and information [presented by the alien] are not true with respect to the qualifying marriage." § 1186a(c)(3)(D).[4]

If the INS does not terminate the alien's conditional resident status under § 1186a(b)(1), then ninety days before the end of the two-year period of conditional status, the alien may attempt to remove the conditional aspect of the permanent resident status by following the procedure outlined in § 1186a(c). First, the alien and spouse must jointly file a petition requesting removal of the condition. § 1186a(c)(1)(A). Next, the alien and spouse must appear for a personal interview before the INS. § 1186a(c)(1)(B). Following the interview, if the INS determines that the alien's marriage to the citizen was entered into in good faith, the INS will remove the condition on the alien's resident status. § 1186a(c)(3)(A)—(B). If the INS makes an unfavorable determination, it will terminate the alien's resident status as of the date of the determination. § 1186a(c)(3)(C). The alien may appeal this determination to the BIA, in which case the burden of proof is on the INS "to establish, by a preponderance of the evidence, that the facts and information [contained in the petition] are not true with respect to the qualifying marriage." § 1186a(c)(3)(D).

There are exceptions to this general procedure. Relevant here, if the alien fails to meet the requirements for timely filing a joint petition, or for jointly appearing for a personal interview, the alien may seek a waiver of these requirements. Upon request, at "the Attorney General's discretion," the INS

---

[4]8 U.S.C. § 1186a(c)(3)(D) provides:

Any alien whose permanent resident status is terminated [by an adverse determination] may request a review of such determination in a proceeding to remove the alien. In such proceeding, the burden of proof shall be on the Attorney General to establish, by a preponderance of the evidence, that the facts and information [presented by the alien] are not true with respect to the qualifying marriage.

can waive this requirement, and remove the conditional basis of the permanent resident status, if the alien demonstrates that the marriage to the U.S. citizen "was entered into in good faith by the alien spouse, but . . . has been terminated (other than through the death of the spouse) and the alien was not at fault in failing to meet the requirements" of submitting a joint petition and appearing for a personal interview. § 1186a(c)(4)(B).[5] The INS also can remove the conditional basis of the alien's permanent resident status if "extreme hardship would result if such alien is removed." § 1186a(c)(4)(A). Hardship is judged by considering "circumstances occurring only during the period that the alien was admitted for permanent residence on a conditional basis." § 1186a(c)(4). Generally, in considering these waiver requests, "[t]he determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General." § 1186a(c)(4).

If the alien does not file the joint petition within the ninety-day period set forth in the statute, then the alien's conditional permanent resident status automatically terminates on the second anniversary of the date the alien received that status. § 1186a(c)(2)(A); 8 C.F.R. § 1216.4(a)(6). In a subsequent removal proceeding, "the burden of proof shall be on the alien to establish compliance" with the joint petition and interview requirements. § 1186a(c)(2)(B).

---

[5]8 U.S.C. § 1186a(c)(4) states in pertinent part:

The Attorney General, in the Attorney General's discretion, may remove the conditional basis of the permanent resident status for an alien who fails to meet the requirements of [filing a joint petition and appearing for an interview] if the alien demonstrates that —

. . .

(B) the qualifying marriage was entered into in good faith by the alien spouse, but the qualifying marriage has been terminated (other than through the death of the spouse) and the alien was not at fault in failing to meet the requirements of [filing a joint petition and appearing for an interview.]

## II

Hammad attempted to obtain his permanent resident status by means of the procedures described above. In 1993, Hammad was admitted to the United States as a nonimmigrant student. He married Veronica Fierro, a United States citizen, in 1994. Fierro submitted a petition to allow Hammad to adjust his status and, on July 3, 1995, Hammad was granted permanent resident status on a conditional basis for two years.

On May 21, 1997, a little over a month before Hammad's two-year status was due to lapse, the couple filed a joint petition to remove the condition on Hammad's resident status. The couple appeared for a personal interview on August 7, 1997, and initially maintained that their marriage was bona fide. INS officials then interviewed Hammad and Fierro separately and discovered inconsistencies between their descriptions of daily life together. After an INS official confronted Fierro with the serious consequences of immigration fraud, Fierro admitted that the marriage had been entered into solely for immigration purposes and withdrew her support of the petition. She also signed an affidavit, dated August 7, 1997, stating that Hammad paid her $2,000 for helping him become a permanent resident and that she had never lived with him or had sexual relations with him. In light of this information, the INS served Hammad with a Notice to Appear (NTA) and a removal hearing was scheduled.

On June 26, 1998, before his removal hearing commenced, Hammad filed a petition under § 1186a(c)(4)(C), asking the INS to waive the joint petition requirement based on having been battered or the subject of extreme cruelty perpetrated by his spouse during the good faith marriage. To support his petition, Hammad submitted an undated written statement, purportedly signed by Fierro, which was not notarized.[6] In that

---

[6]To distinguish Fierro's second statement, which was undated, from her 1997 and 2006 affidavits, the IJ referred to that statement as the "undated one." We adopt the IJ's terminology and refer to Fierro's second statement as "the undated statement."

undated statement, Fierro retracted her prior 1997 sworn statement that her marriage to Hammad was fraudulent and explained that she had lived with Hammad as his wife and had withdrawn support of the joint petition because she felt under duress by the INS. The undated statement further explained that Fierro had withdrawn support of the petition because she was angry with Hammad over rumors that Hammad was planning to remarry. She believed that Hammad was upset with her for having another man's child on October 27, 1995. When Hammad promised to take care of her and her baby, and expressed a desire for the "family to be one unit," Fierro decided to come forward with the truth and reassert her wish that the INS permit Hammad to become a permanent resident.

In addition to submitting the undated statement, Hammad was interviewed again by the INS. At the interview, Hammad explained that contrary to the statement made in his petition, he had not been subject to any mental or physical cruelty during marriage, and that he instead sought a waiver based on having entered into a good faith marriage that ended in divorce. *See* § 1186a(c)(4)(B). Hammad's marriage had not actually ended in divorce at the time of the interview; although Hammad had filed for divorce, the divorce was not yet final.

On October 9, 1998, the INS denied Hammad's petition for a waiver and terminated Hammad's conditional resident status. In its termination letter, the INS noted that the undated statement from Fierro was internally inconsistent, inconsistent with Hammad's testimony, and lacked specificity. Among other things, the INS pointed out that the undated statement supposedly prepared by Fierro asserted that Hammad and Fierro had a bona fide marriage and lived together as husband and wife, but also stated that Fierro had a child by another man less than one year into the marital relationship. The INS also noted that Fierro's undated statement said that Hammad had promised to take care of Fierro and her baby, while Ham-

mad testified in his interview with the INS that he had decided not to get back together with Fierro. The INS concluded that there was evidence that Hammad had engaged in marriage fraud, in violation of § 1154(c).[7] Because there was reason to doubt that Hammad had entered into his marriage with Fierro in good faith and because Hammad had failed to present objective evidence to overcome inconsistencies in the record and to show that the marriage was not fraudulent, the INS denied Hammad's petition.

At his removal hearing in 2006,[8] Hammad requested relief from removal on the ground that the INS had erred in denying his June 1998 petition for a waiver from the joint petition requirement. The government submitted a new declaration from Fierro, dated 2006, which said that the undated statement submitted by Hammad was neither written nor signed by her and, in fact, contained lies. The 2006 affidavit supported Fierro's 1997 story that she married for immigration purposes and never had romantic relations with Hammad. In addition to proffering this new evidence, the government moved to allow Fierro to testify by telephone. Hammad objected because the government had not notified him about Fierro's

---

[7]8 U.S.C. § 1154(c) provides in pertinent part:

[N]o petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

[8]At Hammad's first removal hearing, the IJ ruled that Hammad did not qualify for a waiver to the joint petition requirements, in part because he was not divorced, and issued a final order of deportation. Hammad filed a motion to reopen for ineffective assistance of counsel, which the BIA granted on March 26, 2004. Sometime between July 23, 2003 and June 21, 2005, Hammad finalized his divorce from Fierro and married Rula Yaghmour.

proposed testimony until two days before the hearing. Despite this objection, the IJ granted the government's request, noting that under local court rules, no notice was necessary for testimony being introduced for impeachment or rebuttal purposes. Hammad then requested that the IJ allow his friend, Yassar Dahbour, to testify as a rebuttal witness. When the IJ asked if Dahbour was waiting outside, Hammad responded that Dahbour was available to testify only by telephone, but if the IJ wanted Dahbour to appear in person, Hammad would request a continuance. The IJ allowed Dahbour to appear by telephone and, therefore, denied the continuance motion.

At the hearing, Fierro swore that her 2006 affidavit was truthful, and confirmed that she had never been romantically involved with Hammad. She explained that she had not seen the undated statement purportedly signed by her until the government sent it to her a few months before the hearing. She noted that the undated statement contained several mistakes, such as the date and place of her daughter's birth, as well as the allegation that she was angry with Hammad.

Hammad and his friend Dahbour attempted to counter this testimony by explaining how Fierro came to sign the undated statement. Hammad testified first, and stated that after his attorney prepared the undated statement for Fierro, he drove from his house in Daly City to Fierro's place of work in San Mateo with his friend Dahbour, who was visiting from Sacramento. According to Hammad, after he and Dahbour arrived, Fierro came out of the building, read the statement, and signed it outside of the car, in view of Dahbour. Hammad could not remember the date these events transpired, but testified that it was during the day, a few months after his July 1997 interview. In addition, Hammad was unsure whether he drove his white Nissan or green Toyota, and could not recall whether it was rainy or whether the undated statement was two or three pages long.

Next, Dahbour testified that he had accompanied Hammad to San Mateo to get a document signed near the end of 1997.

He guessed that Hammad drove them in his car to Fierro's place of work in the afternoon, but could not readily recall who drove. According to Dahbour, Hammad called Fierro on his cell phone from the car to come out from her office, which she did. To the best of Dahbour's recollection, Fierro proceeded to open the car door and read a one-page document while standing beside the car, but Dahbour also thought that Fierro may have sat down in the back seat of the car. Dahbour stated that he did not read the undated statement or see Fierro actually sign the document because he was looking away. Instead, he just assumed that Fierro signed it because he saw Hammad hand Fierro a pen and heard Hammad say "thank you" when she left.

After considering all the evidence, the IJ concluded that Hammad had not carried his burden of proving that his marriage was entered into in good faith. According to the IJ, "the evidence of record does not establish that the marriage was a good faith marriage, or that it was entered into with any purpose other than for respondent to gain an immigration benefit." The IJ noted the inconsistencies between Hammad's and Fierro's testimony, and also noted inconsistencies between Hammad's and Dahbour's testimony about how Fierro came to sign the undated statement. The IJ held that Hammad had given false testimony to support his claim, and therefore was not eligible for voluntary departure. Accordingly, the IJ denied Hammad's petition to remove the condition on his resident status, denied his application for voluntary departure, and ordered Hammad removed to Jordan.

Hammad appealed the IJ's July 21, 2006, decision to the BIA, which affirmed the IJ's determination. The BIA held that the IJ did not err in concluding that Hammad's marriage was not bona fide under § 1186a(c), and also rejected Hammad's claim that "several due process violations occurred at his hearing below" because he had failed to show prejudice. Finally, the BIA determined that Hammad "failed to demonstrate that his removal would result in extreme hardship where

circumstances occurring only during the period that he was admitted for permanent residence on a conditional basis can be considered." *See* 8 U.S.C. § 1186(c)(4).

### III

Hammad raises several arguments on appeal. He first argues that the BIA erred in its allocation of the burden of proof on the question whether he had entered into his marriage to Fierro in good faith. Because the government bears this burden of proof, according to Hammad, it was the government's obligation to present sufficient evidence to prove that his marriage was in bad faith. Claiming that the decisions by the BIA and IJ were infected by this erroneous allocation of proof, he also argues that the BIA erred by (1) upholding the IJ's erroneous adverse credibility determination, (2) affirming the INS's denial of Hammad's waiver request, (3) failing to consider whether Hammad was entitled to a waiver based on extreme hardship, and (4) ignoring due process violations at his hearing. We consider each of these arguments in turn.

### A

**[1]** Hammad's overarching argument is that the IJ and BIA erred in holding that he bore the burden of proving that his marriage was bona fide. According to Hammad, § 1186a(b) puts the burden of proof on the government to prove that his marriage was fraudulent. This is incorrect. As noted above, § 1186a(b) applies to the situation where the INS determines that the alien's qualifying marriage was improper during the two-year period before the conditional status terminates. By its terms, § 1186a is inapplicable to Hammad, because the INS did not terminate Hammad's conditional permanent resident status until August 7, 1997, when Hammad's two-year period had already lapsed.

**[2]** The provision applicable to Hammad is § 1186a(c), which provides that an alien's conditional resident status ter-

minates automatically when the alien and the alien's U.S. citizen spouse fail to file a joint petition. We have held that "when one party makes a written withdrawal of support from a joint petition, the petition is considered not to have been filed." *Singh v. Holder*, 591 F.3d 1190, 1198 (9th Cir. 2010). As noted above, when the U.S. citizen fails to file the petition to remove the alien's conditional status, that status terminates automatically at the end of the two-year period, § 1186a(c)(2)(A), and at the subsequent removal hearing, "the burden of proof shall be on the alien to establish compliance" with the requirements for obtaining a removal of conditional status, § 1186a(c)(2)(B). Although Hammad and Fierro timely filed a joint petition and appeared for an interview with the INS, Fierro withdrew her support of the petition before it was adjudicated. Because Fierro's withdrawal of her petition is equivalent to the failure to file, *Singh*, 591 F.3d at 1198, Hammad had the burden of establishing eligibility for a removal of the conditional status.

**[3]** Hammad attempted to establish this eligibility by obtaining a waiver from the joint petition requirement. *See* § 1186a(c)(4). But again, under § 1186a(c)(4), it was Hammad's burden to demonstrate, to the satisfaction of the Attorney General, that "the qualifying marriage was entered into in good faith." § 1186a(c)(4); *see Matter of Mendes*, 20 I. & N. Dec. 833, 838-39 (BIA 1994) (holding that withdrawal of support for a joint petition by a petitioning spouse raises the question whether the marriage was entered into in bad faith, and therefore, "the Act then shifts the burden onto the alien to demonstrate that the marriage was nevertheless entered into in good faith"). Accordingly, the IJ's allocation of the burden of proof was not an error. To the extent Hammad's arguments are based on his claim that the government had an obligation to prove that Hammad's marriage with Fierro was not bona fide, we reject them.

## B

**[4]** Having concluded that the IJ and BIA did not err in determining that Hammad bore the burden of proof, we now

consider Hammad's four subsidiary arguments. Hammad first argues that the IJ's determination that he was not credible was not supported by substantial evidence. According to Hammad, there was no basis in the record to believe Fierro's testimony over his own and, therefore, it was improper for the IJ to base its adverse credibility determination on the inconsistencies between Hammad's and Fierro's testimony. This argument fails in light of the correct standard of review. The BIA's determination "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). "To reverse the BIA finding we must find that the evidence not only supports [petitioner's argument], but compels it." *Id.* at 481 n.1 (emphasis omitted). Here, the record does not compel us to overturn the IJ's and BIA's conclusion. Hammad's testimony was inconsistent not only with Fierro's testimony, but also with the testimony of his own witness, Dahbour. "Because we must accept the IJ's adverse credibility finding if *any* of the supporting grounds proffered in the IJ's decision is valid," *Husyev v. Mukasey*, 528 F.3d 1172, 1183 n.6 (9th Cir. 2008), we affirm the IJ's adverse credibility finding.

C

Second, Hammad argues that the IJ erred in affirming the INS's denial of Hammad's request for a waiver of the joint petition requirement under § 1186a(c)(4)(B), which allows the Attorney General to waive requirements for specified good faith marriages that have terminated. Hammad argues that the evidence in the record would not compel a reasonable factfinder to find that Hammad's marriage was not bona fide.

**[5]** Again, we must reject this claim in light of the correct standard of review. We held in *Oropeza-Wong v. Gonzales*, 406 F.3d 1135 (9th Cir. 2005), that the substantial evidence standard governs our review of waiver determinations under

§ 1186a,[9] and the court "must affirm the BIA's order when there is such relevant evidence as reasonable minds might accept as adequate to support it, even if it is possible to reach a contrary result on the basis of the evidence." *Id.* at 1147; *Damon v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004) ("Whether [the alien] entered into the qualifying marriage in good faith is an intrinsically fact-specific question reviewed under the substantial evidence standard."). Given the numerous inconsistencies in the testimony, Hammad failed to carry this burden. Because the IJ's and BIA's conclusion that Hammad's marriage to Fierro was fraudulent was based on "such relevant evidence as reasonable minds might accept as adequate to support it," *Oropeza-Wong*, 406 F.3d at 1147, there

---

[9]A reasonable question can be raised as to whether we have jurisdiction to review adverse credibility determinations under § 1186a, even though we do have jurisdiction to review determinations regarding whether the alien has demonstrated that "extreme hardship would result" absent a waiver of the joint petition requirement, § 1186a(c)(4)(A). *Singh*, 591 F.3d at 1195 & n.3. Section 1186a(c)(4) states that "[t]he determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General." Congress removed federal courts' "jurisdiction to review a decision of the Attorney General 'the authority for which is specified under [the INA] to be in the discretion of the Attorney General.' " *Kucana v. Holder*, 130 S. Ct. 827, 834 (2010) (quoting § 1252(a)(2)(B)(ii)). Because § 1186a(c)(4) places credibility determinations in the discretion of the Attorney General, the jurisdiction-stripping provision of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) applies. *See* § 1252(a)(2)(B)(ii). The majority of our sister courts have held that we lack jurisdiction to review credibility determinations in this context. *See*, *e.g.*, *Ibrahimi v. Holder*, 566 F.3d 758, 764 (8th Cir. 2009); *Contreras-Salinas v. Holder*, 585 F.3d 710, 713-14 (2d Cir. 2009); *Perales-Cumpean v. Gonzales*, 429 F.3d 977, 984-85 & n.6 (10th Cir. 2005); *Cho v. Gonzales*, 404 F.3d 96, 101 (1st Cir. 2005); *Assaad v. Ashcroft*, 378 F.3d 471, 475 (5th Cir. 2004); *Urena-Tavarez v. Ashcroft*, 367 F.3d 154, 161 (3rd Cir. 2004). Our holding to the contrary in *Oropeza-Wong* has been criticized by other circuits. *See Contreras-Salinas*, 585 F.3d at 714 n.4; *Perales-Cumpean*, 429 F.3d at 985 n.6. But, we are bound by our precedent. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

was substantial evidence to support the BIA's denial of Hammad's 1998 waiver petition.[10]

D

**[6]** Third, even if the BIA had not erred in upholding the INS's denial of his waiver request, Hammad suggests that the IJ and BIA erred in failing to consider a waiver to the joint petition requirement based on extreme hardship. This argument also fails. Hammad did not file a waiver petition with the INS based on extreme hardship, and could not seek such a waiver from the IJ in the first instance. *See Matter of Anderson*, 20 I. & N. Dec. 888, 892 (BIA 1994) ("The immigration judge only has jurisdiction to review the denial of a waiver application."); 8 C.F.R. § 216.5(e)-(f). Nor did Hammad ask the IJ to continue his hearing so he could pursue such a waiver application with the INS. *See Stowers*, 22 I. & N. Dec. at 613-14 ("[W]here an alien is prima facie eligible for a waiver under section 216(c)(4) of the Act [codified as 8 U.S.C. § 1186a(c)(4)] and wishes to have his or her waiver application adjudicated by the Service, the proceedings should be continued in order to allow the Service to adjudicate the waiver application."). In any event, Hammad was not eligible for an extreme hardship waiver. "In determining extreme hardship, the Attorney General shall consider circumstances occurring only during the period that the alien was admitted for permanent residence on a conditional basis." § 1186a(c)(4). Because Hammad's extreme hardship argument is based on the effect his removal will have on a family from his second marriage, which did not exist during his two-year conditional resident status, he does not qualify for a waiver on that ground.

___

[10]Hammad also asks us to hold that the INS erred in determining that there was evidence of marriage fraud in violation of § 1154(c). Because Hammad did not appeal this ruling to the IJ or BIA, it is not exhausted, and we lack jurisdiction to address it. *See Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004).

## E

Finally, Hammad asserts that the last-minute admission of Fierro's telephone testimony and new affidavit at his 2006 hearing before the IJ violated his right to due process because the government did not follow applicable court rules and he was not given adequate time to prepare in light of the IJ's denial of his request for a continuance. Although "[t]he rules of evidence are not applicable to immigration hearings," the proceeding must be conducted "in accord with due process standards of fundamental fairness." *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 370 (9th Cir. 2003) (en banc) (internal quotation marks omitted). A due process violation occurs when the alien shows that the hearing was fundamentally unfair and that the alien "was prejudiced by the violation." *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1162 (9th Cir. 2005); *see Agyeman v. INS*, 296 F.3d 871, 876-77 (9th Cir. 2002).

**[7]** Hammad cannot show that the admission of Fierro's telephone testimony was fundamentally unfair. The government's notification of Hammad two days before trial did not violate the local court rule Hammad cites. *See* Local Operating Procedure No. 3, Immigration Court, San Francisco, CA (stating that "pre-hearing briefs and proposed exhibits must be filed with the Immigration Court no later than fifteen (15) calendar days before the scheduled Individual Calendar hearing," but this "procedure shall not apply to exhibits which are to be submitted for purposes of rebuttal and impeachment"). Because the government proffered Fierro's testimony and 2006 affidavit to impeach Hammad's testimony, the government was not required to give fifteen days notice. Furthermore, the government informed Hammad of the substance of Fierro's testimony two days before the hearing, and Hammad had the opportunity to cross-examine Fierro and offer the testimony of a rebuttal witness. *Cf. Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 823 (9th Cir. 2003) (holding that the introduc-

tion of hearsay was fair in part because "Rojas-Garcia had the opportunity to cross-examine both officers").

[8] Hammad's argument that he requested a continuance to allow him time to prepare a proper cross-examination of Fierro, is contradicted by the record. The hearing transcript establishes that he requested a continuance only if Dahbour had to testify in person. The IJ's decision to allow Dahbour to testify by telephone mooted the request for a continuance. Moreover, the IJ's denial of Hammad's request for a continuance did not deny Hammad the opportunity to fully present his case. Despite the denial of the continuance, Hammad was able to present his version of the events, cross-examine Fierro, and have Dahbour testify on his behalf to rebut Fierro's assertions. Because Hammad was not deprived of a fundamentally fair trial, he cannot claim a violation of due process.

IV

Hammad has traveled far down the road of turning his conditional legal resident status into a permanent status. Although Hammad makes many arguments why he should be allowed to take the final step, his wife's withdrawal of her support and the INS's determination that Hammad had not entered into the marriage in good faith are fatal. The IJ's and BIA's rulings against Hammad were supported by substantial evidence in the record and, in light of our standard of review, none of Hammad's arguments can prevail.

**PETITION DENIED**.